# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 01-3077EA, 01-3082EA, 01-3266EA, 01-3428EA, 01-3526EA
_____

_____

No. 01-3077EA
_____

United States of America,

        Appellee,

v.

Bob Newton Rushing,

        Appellant.

_____

Nos. 01-3082EA,  01-3266EA
_____

United States of America,

        Appellee/Cross-Appellant,

v.

David Jewell Jones,

        Appellant/Cross-Appellee.

On Appeal from the United
States District Court
for the Eastern District
of Arkansas.

_____   *
                                   *
   Nos. 01-3428EA, 01-3526EA       *
_____   *
                                   *
United States of America,          *    On Appeal from the United
                                   *    States District Court
        Appellee/Cross-Appellant,  *    for the Eastern District
                                   *    of Arkansas.
   v.                              *
                                   *
Tony Ma, also known as Shiu Yun Ma,  *
                                   *
        Appellant/Cross-Appellee.  *
                                   *

_____

Submitted:  September 9, 2002
Filed:  December 17, 2002
_____

Before McMILLIAN, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.
_____

RICHARD S. ARNOLD, Circuit Judge.

David Jones, Tony Ma, and Bob Rushing have been convicted of various offenses involving the immigration of two Chinese women into the United States. All three defendants were convicted of conspiring to violate 18 U.S.C. § 1546(a) by supplying false information in order to obtain visas for the women. Messrs. Jones and Ma were also convicted of harboring an illegal alien, a violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Mr. Jones was sentenced to three years' probation, fined $10,000.00, and assessed $200.00 in mandatory costs. His probation was conditioned upon service of one month in a halfway house, followed by eleven months of home detention. Dr. Rushing was sentenced to three years' probation, fined $5,000.00, and

assessed $100.00 in costs. Mr. Ma was sentenced to three years' probation, fined $5,000.00, and assessed $200.00 in costs.

All three defendants appeal, urging a variety of grounds for reversal of their convictions. We believe that most of their arguments are without merit. We think, however, that two particular points deserve further proceedings in the trial court. One of these points concerns the District Court's decision to exclude, by a ruling made before trial, expert medical testimony proffered by Mr. Jones. The District Court believed that this evidence concerned a collateral issue and excluded it under Fed. R. Evid. 403. We respectfully disagree with that ruling. Further proceedings will be necessary on remand to determine whether the evidence should have been excluded on other grounds.

The other point concerns a statement made by the government with respect to one of its witnesses. This witness, Ms. Zhong, one of the Chinese women in question, testified at a previous trial (which ended in a hung jury) that Mr. Jones had raped her. She then recanted, admitting that she had lied, and testified that Mr. Jones had had sexual relations with her, but with her consent. She testified to the same effect at the second trial, which ended in convictions. At the second trial, counsel for the United States told the jury that Ms. Zhong would be prosecuted and deported. After the end of the second trial, however, when Ms. Zhong appeared before the District Court (presided over by another judge) for sentencing, the government did not seek to have Ms. Zhong deported, but instead said it would help her in an application for asylum. This change in position has not been explained. It needs to be. The case will be remanded for the District Court to hold a hearing to determine when the government changed its position, and why.

This Court will retain jurisdiction while the remand with respect to these two issues takes place. We ask the District Court to hold a hearing on the issues indicated and to certify its findings and conclusions to this Court. We will then review those

findings and conclusions after giving the parties an appropriate chance to set forth their positions. Whether these convictions will stand will depend on the ultimate outcome of this review.

Sentencing issues are also before us. Mr. Jones appeals his sentence, and the government cross-appeals the sentences imposed on Mr. Jones and Mr. Ma. We do not reach these issues at this time. At the end of the day, if the convictions are affirmed, we will reach and decide the sentencing issues.

I.

In this case, the government alleged that the defendants and three other individuals — Tony Ma's wife Mary, Mark Riable, and Levy Johns[1] — were engaged in a conspiracy to commit immigration fraud. The government alleged that the purpose of the conspiracy was to bring two Chinese women, Ms. Wu and Ms. Zhong, into the country for the sexual gratification of Mr. Jones. The fraud was allegedly carried out by falsely representing on the women's visa applications that they intended to marry, respectively, Dr. Rushing and Mr. Johns. The jury ultimately convicted Mr. Jones, Dr. Rushing, and Tony Ma but acquitted Mary Ma and Mark Riable.

The events that gave rise to this case began in September of 1991, when the appellants went to China to find Tony Ma a bride.[2] On this trip, Mr. Ma met Mary, who eventually became his bride and moved to the United States with him. While in China, the appellants also met Ms. Wu and Ms. Zhong. The government alleges that

---

[1]Mr. Johns was not indicted; he died before the case went to trial.

[2]Mr. Ma had become a naturalized citizen in August of 1991 but wanted to marry a woman from his home country.

Mr. Jones took an immediate liking to Ms. Wu, and introduced photographs taken of the two of them together while in China.

Once the appellants arrived back in the United States, they set out to get Ms. Wu into the country, allegedly so that Mr. Jones could engage in a sexual relationship with her. The defendants initially tried to get her a student visa. In attempting to procure this visa, Mr. Jones used his position on the Board of Trustees of Henderson State University to get Ms. Wu admitted and to get her a scholarship. Ultimately, however, the Immigration and Naturalization Service (INS) rejected Ms. Wu's visa application. Still wanting to get her into the country, Mr. Jones, it is said, arranged for Dr. Rushing to pose as Ms. Wu's fiancé to procure a fiancé visa. The INS eventually granted Ms. Wu a visa on this basis, allowing her to enter the country.

Upon arriving in Little Rock, Arkansas, Ms. Wu lived with Tony and Mary Ma and worked in their restaurant. On October 13, 1992, Ms. Wu and Dr. Rushing went through a marriage ceremony performed by Mark Riable, an attorney and municipal judge. Dr. Rushing and Ms. Wu never consummated their marriage, however, and, according to the divorce papers that were filed later, they were separated the day after their wedding. Nevertheless, over the next two weeks, Mr. Jones prepared a petition for permanent residence for Ms. Wu, and Dr. Rushing accompanied her to the Memphis, Tennessee, INS office, where they presented themselves as married.

The government alleges that during this period Mr. Jones was engaged in a sexual relationship with Ms. Wu. In late 1992, however, Ms. Wu broke off her relationship with Mr. Jones and returned to China. Dr. Rushing then filed for divorce in January of 1993. Ms. Wu reentered the United States in spring of 1993. The INS official who readmitted her noted a problem with her file, so he paroled her into the country with instructions to report to the INS office in Memphis, Tennessee. Ms. Wu failed to report, settling instead in Seattle, Washington. Because Ms. Wu failed to report, the INS sent an inquiry to her at Dr. Rushing's dental office, which was listed

as her mailing address. In response, Dr. Rushing and Mr. Riable sent the divorce decree to the INS office in December of 1993.

In April or May of 1993, after Ms. Wu's departure, the government says, appellants got in touch with Ms. Zhong about coming to the United States. They first attempted to get her admitted to work as a babysitter for the Mas' child. When this attempt was unsuccessful, the appellants recruited Levy Johns to pose as Ms. Zhong's fiancé. Mr. Jones paid for Mr. Johns to fly to China to meet Ms. Zhong. While there, Mr. Johns and Ms. Zhong took pictures together to submit to the INS. Ms. Zhong was able to obtain a visa, and she moved to Little Rock, Arkansas. She lived with the Mas, never marrying Mr. Johns. The government alleges that instead Ms. Zhong engaged in a year-long sexual relationship with Mr. Jones. Ms. Zhong so testified at trial and indicated that they often had unprotected sex. Eventually she discontinued the relationship and moved out of the Mas' house to live with friends.

At the urging of one of these friends, Ms. Zhong eventually made up a story that she had never consented to sex with Mr. Jones. She reported this to the Pulaski County Sheriff's Department and to the INS in a series of interviews. After investigating Ms. Zhong's immigration file and finding Ms. Wu, the United States brought charges of conspiracy to commit immigration fraud and harboring an illegal alien against the five defendants. At trial, Ms. Zhong initially testified that Mr. Jones had raped her. She eventually recanted, however, admitting on the stand that the rape story was a lie. At that point, she said that the sexual relationship with Mr. Jones had been consensual. This trial resulted in a hung jury, so the Court declared a mistrial. The government then obtained a superseding indictment and retried the defendants. The jury convicted Mr. Jones, Mr. Ma, and Dr. Rushing of conspiracy to commit immigration fraud and convicted Messrs. Ma and Jones of harboring an illegal alien. Mrs. Ma and Mr. Riable were acquitted. Mr. Jones, Mr. Ma, and Dr. Rushing appeal their convictions to this Court, alleging numerous errors by the District Court. Mr. Jones also appeals his sentence. The government cross-appeals, alleging that the

District Court incorrectly applied the Sentencing Guidelines in sentencing Messrs. Jones and Ma.

## II.

We first address briefly a number of issues we believe to be without merit. First, the defendants argue that count I of the indictment was duplicitous, in that it charged more than one offense in a single count. Defendants take the position that count I actually charged two conspiracies, one involving Ms. Wu and one involving Ms. Zhong. We disagree. As a matter of pleading, count I clearly alleges one continuing conspiracy: an illegal agreement to bring both women into this country by fraud. In a related contention, defendants argue that the District Court erred in refusing to instruct the jury to decide whether the proof showed a single conspiracy, or two conspiracies. This error, if there was one, was harmless under the facts of this case. See United State v. Roark, 924 F.2d 1426, 1429 (8th Cir. 1991) (stating that a variance requires reversal only if it results in substantial prejudice to a defendant). Mr. Jones and Mr. Ma were allegedly members of both conspiracies (accepting for the sake of argument that a two-conspiracy view of the evidence could have been accepted by the jury). Under the proof, any jury that convicted Mr. Jones and Mr. Ma of the conspiracy to import the two women (accepting the government's single-conspiracy theory) would also have logically had to convict them of participating in both of the claimed separate conspiracies. So an instruction requiring the jury to decide whether there were two conspiracies instead of only one would not have helped the defendants. It is clear to us that they would have been convicted in either event.

Dr. Rushing presents a different argument. If the alleged events constituted two conspiracies, instead of one, he was involved, at most, only in the first one, the one concerning Ms. Wu, and, he argues, the statute of limitations had run on this conspiracy. We disagree. In December of 1993, as we have recounted above, Dr.

Rushing caused his divorce decree to be sent to the INS in response to its inquiry. By this act, he implicitly represented that he and Ms. Wu had at one time been validly married. This was an act of concealment, and it occurred within the limitations period.

The next contention concerns information that came out during cross-examination of FBI Special Agent Daniel Wehr, the government's last witness. Mr. Wehr disclosed for the first time that Ms. Wu had initially denied any sexual relationship with Mr. Jones. She changed her story only after Agent Wehr told her (falsely) that Mr. Jones was telling people that he and Ms. Wu had had intercourse. Defendants argue that this information should have been disclosed to them earlier, and that if it had been, the strategy of the defense would have changed. We do not doubt that the evidence should have been disclosed earlier, and we do not know why the government failed in this duty. In the present circumstances, however, the error was not prejudicial. The evidence was fully disclosed to the defense during this trial, and the District Court gave defense counsel leave to recall Ms. Wu and another witness, FBI Agent Ronald Steven Kidd, to cross-examine them further about this revelation. Defense counsel used this opportunity to question these witnesses about Ms. Wu's statement and further to undermine their credibility. Nor have they explained to this Court how their strategy would have been different if they had known from the beginning about the change in Ms. Wu's statements. The defense position had always been that Mr. Jones and Ms. Wu had not had sexual relations. The belatedly disclosed evidence certainly supported this position, but it came out in time for the jury to know it, and for the defense to use it before the jury.

During the government's case, one of its witnesses referred to Dr. Rushing's having taken a polygraph test, without stating the results. This reference was in violation of a previous order of the trial court. A government witness also referred to the fact that Mr. Jones had refused to talk to investigators at an early stage of the investigation. In each instance, the District Court instructed the jury to ignore the

comments. Our normal practice is to assume that juries follow instructions. We see no reason to depart from this practice here.

During Ms. Zhong's testimony, the matter of her conversion to Christianity came up, supposedly in connection with her credibility. The Court allowed defendants to cross-examine Ms. Zhong on the subject, but excluded such questioning of other witnesses. We see no abuse of discretion here. Fed. R. Evid. 610 puts this kind of evidence out of bounds for most purposes. Moreover, the judge gave a cautionary instruction to the jury. Any error that might have occurred was cured.

Finally, defendants Ma and Jones argue that there was insufficient evidence to sustain their convictions for harboring, and that the Court's instructions to the jury defining this offense were in error. They argue that they did not try to hide Ms. Zhong, and that she was working in Mr. Ma's restaurant in plain view. We reject this argument. The evidence reasonably justified a finding that Mr. Ma, knowing that Ms. Zhong had entered the country illegally, gave her a job and a place to live. There was also sufficient evidence, if believed, that Mr. Jones, with the same knowledge, helped Ms. Zhong receive medical care and banking privileges. These activities are more than enough to support a conviction for harboring an illegal alien. United States v. de Evans, 531 F.2d 428, 430 (9th Cir. 1976) (holding that a conviction for harboring does not require proof of secrecy or concealment).

A number of other errors are alleged. After reviewing the record and the briefs, we conclude that none of them has merit, except for those points discussed later in this opinion.

### III.

Defendants' first potentially winning argument arises out of the District Court's refusal to allow the testimony of Dr. Paul Gubbins. Dr. Gubbins was prepared to

offer his expert opinion that the medical conditions of Ms. Zhong and Mr. Jones indicated that they did not engage in a year-long sexual relationship, as Ms. Zhong claimed. He would have testified that Ms. Zhong was infected with Hepatitis B, but Mr. Jones was not. He would have further testified that if Mr. Jones and Ms. Zhong had engaged in a sexual relationship for a year, as the government alleged, it would be highly likely that Mr. Jones would have been infected. He was also prepared to testify about the prevalence of Hepatitis in China and its infrequency in the United States, as indicating that Ms. Zhong was infected at the time of entry into the United States. This testimony would have tended to prove that Mr. Jones and Ms. Zhong did not engage in the long-term relationship that the government alleged. Mr. Jones asked for a Daubert hearing on this evidence, but the District Court refused.

The government responded with a proffer from its own expert, an official from the Centers for Disease Control, indicating that if Ms. Zhong was infected with Hepatitis B, and Mr. Jones engaged in a one-year sexual relationship with her, he would have had only a one per cent. chance of being infected. The government argued that, given this testimony, Dr. Gubbins's testimony had no probative value. The District Court ultimately excluded Dr. Gubbins's testimony because it found the testimony collateral to the issue of whether the defendants had engaged in immigration fraud.

This Court reviews the exclusion of evidence for an abuse of discretion. United States v. Ballew, 40 F.3d 936 (8th Cir. 1994). The District Court's decision to exclude the evidence because it was a collateral issue was based on Federal Rule of Evidence 403. Under Rule 403, a court may exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. This rule calls on courts to weigh the value of the evidence against both the threat of impermissible jury behavior and waste of the court's time.

The District Court believed that the evidence was of little probative value on the central issues of the case. We respectfully disagree with this conclusion. Indeed, we conclude that the proffered testimony of Dr. Gubbins was highly probative. His testimony amounted to his expert opinion that Mr. Jones and Ms. Zhong likely did not engage in a sexual relationship. Although this is not an element of immigration fraud, the government's theory of the case was that the defendants committed immigration fraud to import women into the country to satisfy Mr. Jones's sexual appetite. This motivation was alleged in the indictment. Evidence that Mr. Jones never engaged in sexual relations with Ms. Zhong would have undermined this theory, leaving the government with no explanation of why the defendants engaged in immigration fraud. Put another way, although the crime of immigration fraud need not be about sex, the government's allegations in this case made it about sex. Thus, Dr. Gubbins's testimony would have been highly probative.

The government challenges the testimony's probative value in two respects. First, the government argues that the record does not establish that Ms. Zhong was infected with Hepatitis B at the time that she was allegedly having a sexual relationship with Mr. Jones. Appellee's Brief In Response to David Jewell Jones 30-31. The government is correct that no direct evidence was presented to this effect; however, this does not mean that the testimony of Dr. Gubbins would lack probative value. Ms. Zhong clearly became infected at some point. Dr. Gubbins was prepared to testify that Hepatitis B is prevalent in China and not in the United States, thus making it more likely that Ms. Zhong became infected before she entered the United States.

The government next responds that the proffered testimony was nevertheless of little probative value given its own expert's proffered testimony that Mr. Jones would have had only a one per cent. chance of contracting Hepatitis B if he had engaged in a year-long relationship with Ms. Zhong. Appellee's Brief In Response to David Jewell Jones 30-31. The government is asking this Court to weigh the

probative value of Dr. Gubbins's testimony on the basis of the testimony of its proffered expert. The problem is that Dr. Gubbins appears to disagree with the government's witness about the likelihood that Mr. Jones would have contracted the disease. We do not know which expert the jury would have believed. That the government would have presented an opposing expert is not a sufficient reason, in the circumstances of this case, to exclude this evidence.

On appeal, the government argues that this evidence was nevertheless excludable because it was unreliable under Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993). The District Court did not exclude the evidence on this ground, however; indeed, the Court did not even hold a Daubert hearing to consider the evidence. The Court instead opted to exclude the evidence as collateral to the issue in the case. Because the District Court did not address the reliability issue, there is no record upon which this Court could make an appropriate ruling on that issue. Thus, we cannot reach this question now.

In concluding that the evidence was not excludable as collateral, we do not intend to indicate that the evidence was necessarily admissible expert testimony. We hold only that it was not properly excludable under Rule 403. On remand, the District Court must consider whether the testimony meets the strictures of Daubert. In making this decision, the Court may consider any scientific evidence offered by either side, including the opinion of the government's expert.

IV.

The second argument which deserves further exploration is the defendants' contention that the prosecution violated Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). Counsel for the United States represented to the jury, in view of Ms. Zhong's confessed perjury, that they would seek her deportation after the trial was completed. They then failed to do so and

actually stated an intention to aid in her application for asylum. As to this charge, the government's briefs in this Court say only: "The second jury was truthfully told the government would seek prison time and deportment [sic], though circumstances changed later. There was no undisclosed 'deal' with Zhong." E.g., Appellee's Brief in Response to David Jewell Jones 57.

The defendants claim that the government knew, when it made its representations to the jury, that it did not intend to seek to deport Ms. Zhong. If this is so, obviously a grave violation, ethical as well as legal, has occurred. Under Brady, prosecutors must turn over all exculpatory evidence to criminal defendants. 373 U.S. at 87. This duty includes evidence going to the credibility of a government witness, such as promises that may have been made to that witness. In Giglio, the Court held that the prosecution can neither lie itself, nor present testimony that it knows to be false. 405 U.S. at 153. The difficulty is that there is no evidence in this record to support defendants' charges. Ordinarily, this circumstance would be dispositive against them. In the present case, however, the major event that raises a question — the government's current decision to help Ms. Zhong with her application for asylum — did not occur until after the verdict in this case. The jury's verdict was returned on May 23, 2001, and defendants were sentenced on August 14, 2001. It was not until September 20, 2001, that Ms. Zhong's change of plea hearing took place before another judge of the District Court. It was at this time that the government made public its change of position. We do not know when that change occurred. This is a question of fact that should be explored on remand.

Even if nothing happened here but a genuine change in position after the conclusion of this trial, and we hope that is the case, a serious question is raised by the sequence of events. The credibility of Ms. Zhong was central to the government's case. For a jury to believe that the prosecution was going to advocate her deportation, when in fact the opposite later occurred, raises questions of fundamental fairness under the Due Process Clause of the Fifth Amendment. Simply saying that

-13-

"circumstances changed later" is not good enough. The contrast between the government's stated intention and what actually occurred is too jarring to overlook. Circumstances do change, of course. We recognize that. In addition, it is generally within the government's discretion to decide what sort of plea agreement to offer a given defendant. What disturbs us is that the government has, up to now, failed to explain the events that occurred here. Such an explanation should be made to the District Court on remand. That Court should, among any other issues it finds appropriate to explore, inquire into the time when the government decided to aid Ms. Zhong in her request for asylum, and the reason for its change of position. As indicated above, the findings of the District Court on this issue, as well as on the expert-testimony question, should be certified to this Court for review.

Remanded with instructions.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.